**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| MELBOURNE MUNICIPAL FIREFIGHTERS' PENSION TRUST FUND, derivatively on behalf of QUALCOMM, INCORPORATED, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PAUL E. JACOBS; STEVEN M. MOLLENKOPF; BARBARA T. ALEXANDER; DONALD G. CRUICKSHANK; RAYMOND V. DITTAMORE; SUSAN HOCKFIELD; THOMAS W. HORTON; SHERRY LANSING; HARISH MANWANI; DUANE A. NELLES; CLARK T. RANDT, JR.; FRANCISCO ROS; JONATHAN J. RUBINSTEIN; GENERAL BRENT SCOWCROFT; MARC I. STERN; and JING WANG, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 10872-VCMR |
| Defendants, | ) ) | |
| -and- | ) ) | |
| QUALCOMM, INCORPORATED, | ) ) | |
| Nominal Defendant. | ) | |

**MEMORANDUM OPINION**

Date Submitted: April 5, 2016
Date Decided: August 1, 2016

Joel Friedlander, Jeffrey Gorris, Christopher M. Foulds, and Benjamin P. Chapple, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Mark Lebovitch, David Wales, Christopher J. Orrico, and John Vielandi, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Brett M. Middleton, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, San Diego, California; *Attorneys for Plaintiff Melbourne Municipal Firefighters' Pension Trust Fund.*

Peter J. Walsh, Jr. and Andrew H. Sauder, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Rachel G. Skaistis, CRAVATH, SWAINE & MOORE LLP, New York, New York; *Attorneys for Defendants Paul E. Jacobs, Steven M. Mollenkopf, Barbara T. Alexander, Donald G. Cruickshank, Raymond V. Dittamore, Susan Hockfield, Thomas W. Horton, Sherry Lansing, Harish Manwani, Duane A. Nelles, Clark T. Randt, Jr., Francisco Ros, Jonathan J. Rubenstein, General Brent Scowcroft, and Marc I. Stern.*

David E. Ross, ROSS ARONSTAM & MORITZ, Wilmington, Delaware; *Attorney for Nominal Defendant Qualcomm, Incorporated.*

**MONTGOMERY-REEVES, Vice Chancellor.**

The plaintiff's Verified Stockholder Derivative Complaint, brought on behalf of Qualcomm, Incorporated, alleges that certain Qualcomm officers and directors damaged the company by repeatedly allowing and causing it to violate international antitrust laws. The crux of the plaintiff's complaint is that Qualcomm's board of directors breached its duty of loyalty because it was on notice as to corporate misconduct and consciously disregarded its duty to remedy or prevent such misconduct—*i.e.*, what is known colloquially as a *Caremark* claim. The plaintiff did not demand that the board pursue its claims before bringing this action. According to the plaintiff, any such demand would have been futile because a majority of Qualcomm's directors face a substantial likelihood of personal liability as to the underlying claims.

The defendants responded by filing a motion to dismiss the plaintiff's complaint under Court of Chancery Rules 12(b)(6) and 23.1. For the reasons stated in this Memorandum Opinion, I grant the defendants' motion to dismiss.

1

# I. BACKGROUND[1]

## A. Parties

Plaintiff Melbourne Municipal Firefighters' Pension Trust Fund ("Plaintiff") is a statutorily created Florida retirement system that provides pension benefits to retired Melbourne municipal firefighters. Plaintiff is a stockholder of Qualcomm, Incorporated ("Qualcomm" or the "Company") and has been at all times relevant for purposes of this action.

Defendants Paul E. Jacobs, Steven M. Mollenkopf, Barbara T. Alexander, Donald G. Cruickshank, Raymond V. Dittamore, Susan Hockfield, Thomas W. Horton, Sherry Lansing, Harish Manwani, Duane A. Nelles, Clark T. Randt, Jr., Francisco Ros, Jonathan J. Rubinstein, General Brent Scowcroft, and Marc I. Stern (the "Director Defendants") all were members of Qualcomm's board of directors (the "Board") at the time Plaintiff filed its Complaint. Jacobs, Alexander,

---

[1] The facts are drawn from the particularized allegations of the plaintiff's Verified Stockholder Derivative Complaint (the "Complaint"), the attachments thereto, and the documents incorporated into the Complaint by reference. *See In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 659 n.3 (Del. Ch. 2013) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." (quoting *DeLuca v. AccessIT Gp., Inc.*, 659 F. Supp. 2d 54, 60 (S.D.N.Y. 2010))). "When considering a motion to dismiss under Rule 23.1, this Court affords plaintiffs all reasonable inferences that logically flow from the particularized facts alleged in the complaint." *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 552305, at *4 (Del. Ch. Feb. 29, 2008). Those allegations and inferences, as well as the facts drawn from documents attached to and incorporated by referenced into the Complaint, are assumed true for purposes of a motion to dismiss.

Cruickshank, Dittamore, Horton, Lansing, Nelles, Scowcroft, and Stern all served on the Board since before 2009.

Jacobs has served as the Chairman of the Board since 2009 and was the Company's CEO from 2005 to 2014. Mollenkopf has been the Company's CEO since 2014 and served in various other executive capacities from 2002 to 2014. Jacobs and Mollenkopf are referred to as the "Officer Defendants"[2] and, together with the Director Defendants, "Defendants."

Nominal Defendant Qualcomm is a San Diego-based Delaware corporation. "The Company designs, develops, manufactures, and markets digital communications products and services,"[3] including integrated circuits (or "chips") and other technologies used in telecommunications devices. "In public filings, Qualcomm describes itself as the leader in the development and commercialization of a digital communication technology called CDMA (Code Division Multiple Access)."[4] Its largest markets are in China, South Korea, Taiwan, and the United

---

[2] The Complaint also names Jing Wang, a former Executive Vice President and President of Global Business Operations for Qualcomm and the former Chairman of Qualcomm China, as an Officer Defendant. On July 22, 2015, Plaintiff voluntarily dismissed Wang from this action pursuant to Court of Chancery Rule 41(a)(1)(i). *See* Notice of Dismissal as to Defendant Jing Wang, Docket Item No. 19.

[3] Compl. ¶ 12.

[4] *Id.*

States.  Qualcomm's shares are listed on the NASDAQ under the symbol "QCOM."

### B.  Facts

#### 1.  Qualcomm's market power and business practices

Qualcomm is a global force in the wireless telecommunications market. That market utilizes industrywide standards "to ensure compatibility and interoperability of devices manufactured by different companies."[5]  Because of its success, a number of Qualcomm's technologies and patents have been adopted as "essential" under the relevant industry standards.  This, in turn, makes Qualcomm's products "integral to many aspects of wireless and mobile communication and the associated devices."[6]

As a result of its position in the wireless telecommunications market, "Qualcomm has turned into a toll collector for almost every smartphone manufactured."[7]  Specifically, Qualcomm monetizes its technologies and patents through two key business segments:  (1) Qualcomm Technology Licensing ("QTL") and (2) Qualcomm CDMA Technologies ("QCT").  QTL generates the

---

[5]     *Id.* ¶ 58.

[6]     *Id.* ¶ 36.

[7]     *Id.* ¶ 43; *see also id.* ¶ 46 ("Qualcomm receives approximately 3% to 5% on every 3G/4G LTE handset sold anywhere in the world.").

majority of Qualcomm's revenue by licensing its patent portfolio to third-party manufacturers in exchange for royalty fees. QCT, which constitutes the other major source of Qualcomm's revenue, designs "integrated circuit products used in a wide variety of wireless devices."[8]

Because of its market power and ownership of essential technologies and patents, Qualcomm has acknowledged that it has an obligation to offer to license its products on fair, reasonable, and non-discriminatory ("FRAND") terms.[9] Despite that acknowledgement, however, Qualcomm allegedly has engaged in business practices that leverage its market power in an anticompetitive and abusive manner. In particular, the Complaint alleges that Qualcomm has (1) charged unreasonably high licensing fees, (2) forced licensees to pay for unwanted products by bundling and tying patent licenses, (3) demanded licensees provide certain royalty-free licenses in return, and (4) imposed unreasonable conditions on licensees and chip purchasers.

### 2. Qualcomm pays $891 million to settle a competitor's antitrust claims

In 2005, Broadcom Corporation ("Broadcom") filed a lawsuit against Qualcomm (the "Broadcom Action") in the United States District Court for the

---

[8]     *Id.* ¶ 50.

[9]     *Id.* ¶¶ 58-61.

District of New Jersey. Broadcom asserted antitrust claims against Qualcomm, stating that "by its intentional deception of private standards-determining organizations and its predatory acquisition of a potential rival, [Qualcomm] has monopolized certain markets for cellular telephone technology and components, primarily in violation of Sections 1 and 2 of the Sherman Act and Sections 3 and 7 of the Clayton Act."[10] Specifically, Broadcom alleged that Qualcomm falsely induced the standards-determining organizations to adopt its technologies and patents in the industrywide standards by falsely agreeing to license on FRAND terms. Broadcom also accused Qualcomm of licensing its technologies and patents on non-FRAND terms to competitors and customers who used non-Qualcomm chips.

On August 30, 2006, the District Court dismissed the complaint for failure to state a claim.[11] On September 4, 2007, the United States Court of Appeals for the Third Circuit reversed the District Court's ruling in part and concluded that Broadcom had "stated claims for monopolization and attempted monopolization under § 2 of the Sherman Act."[12] As such, the Third Circuit remanded those claims back to the District Court for further proceedings.

---

[10] *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 303 (3d Cir. 2007).

[11] *Id.* at 305.

[12] *Id.* at 303.

On April 26, 2009, Broadcom and Qualcomm settled the Broadcom Action (the "Broadcom Settlement"). In the Settlement, Qualcomm agreed to pay Broadcom $891 million over the next four years. According to Qualcomm's Form 10-K filed on November 5, 2009 (the "2009 10-K"), "[t]he principal benefits to the Company from entering into the Agreement were (i) the termination of litigation between the parties which allows the Company to avoid future litigation expenses and (ii) the avoidance of future customer disruption; accordingly, the predominant component of the arrangement was the litigation settlement."[13] In addition, the 2009 10-K characterized the Broadcom Action as "without merit."[14]

### 3. The Korea Fair Trade Commission finds Qualcomm in violation of South Korean antitrust laws

On July 23, 2009, less than three months after the Broadcom Settlement, the Korea Fair Trade Commission (the "KFTC") concluded an investigation of Qualcomm and issued a decision imposing on Qualcomm corrective orders and a $208 million fine (the "KFTC Decision").[15] The KFTC Decision, entitled "Qualcomm's Abuse of Market Dominance," found that "Qualcomm is an unequivocally dominant firm in the Korean CDMA modem chip market with

---

[13]   Trans. Aff. of Benjamin Chapple ("Chapple Aff.") Ex. 7 ("2009 10-K"), at F-27.

[14]   *Id.*

[15]   Chapple Aff. Ex. 13 ("KFTC Decision"), at 1.

7

99.4% market share."[16]  Further, the KFTC Decision found that the Company abused its dominant position by (1) licensing its technologies and patents on non-FRAND terms to customers who used non-Qualcomm chips, (2) offering rebates to purchasers who "[met] the great portion of their demand with Qualcomm chips," and (3) bundling its licenses such that licensees paid royalties for expired or invalid patents.[17]  Thus, the KFTC concluded that Qualcomm, through those abusive practices, excluded its competitors from the CDMA markets, "thereby maintaining its market dominance."[18]  And, in addition to the $208 million fine, the KFTC Decision ordered Qualcomm to discontinue the above-described business practices.

In its Form 10-K filed on November 3, 2010 (the "2010 10-K"), Qualcomm disclosed that "[t]wo U.S. companies (Texas Instruments and Broadcom) and two South Korean companies (Nextreaming and Thin Multimedia) filed complaints with the KFTC" regarding the Company's business practices,[19] which ultimately precipitated the KFTC's investigation of Qualcomm and the KFTC Decision.  As to the KFTC Decision itself, Qualcomm stated that it did "not anticipate that the

---

[16]     *Id.*

[17]     *Id.* at 1-2.

[18]     *Id.* at 1.

[19]     Chapple Aff. Ex. 8 ("2010 10-K"), at F-26.  Broadcom subsequently "withdrew its complaint to the KFTC in May 2009," as required by the Broadcom Settlement. *Id.*

cease and desist remedies ordered [would] have a material effect on the results of its operations."[20]  Qualcomm also disclosed that it "believes that its practices do not violate South Korean competition law, are grounded in sound business practice and are consistent with its customers' desires."[21]

Although Qualcomm paid the KFTC's $208 million fine in 2010, it ultimately appealed the KFTC Decision to the Seoul High Court.  On June 19, 2013, the Seoul High Court affirmed the KFTC Decision, and, on July 4, 2013, Qualcomm appealed that affirmance to the Korea Supreme Court.  That appeal remains pending.

### 4. The Japan Fair Trade Commission finds Qualcomm in violation of Japanese antitrust laws

On September 29, 2009, two months after the KFTC Decision and five months after the Broadcom Settlement, the Japan Fair Trade Commission (the "JFTC") issued a Cease and Desist Order against Qualcomm (the "JFTC Order"). That Order, which was issued after the JFTC performed an investigation pursuant to Japan's Antimonopoly Act (the "AMA"), "found [Qualcomm] to be in violation of Article 19 of the AMA."[22]  Specifically, the JFTC concluded that Qualcomm

---

[20]    *Id.*

[21]    *Id.*

[22]    Chapple Aff. Ex. 16 ("JFTC Order"), at 1.

9

had coerced Japanese manufacturers to surrender various intellectual property rights in exchange for the right to purchase Qualcomm's chips and license Qualcomm's technologies and patents.[23] To remedy those abusive practices, the JFTC ordered Qualcomm to rescind the violative provisions from the license agreements with Japanese manufacturers and to refrain from reengaging in the above-described conduct.

In the 2009 10-K, Qualcomm noted that the JFTC had "received unspecified complaints alleging that the Company's business practices are, in some way, a violation of Japanese law" and summarized the findings and terms of the JFTC Order.[24] Qualcomm also stated that "[t]he Company disagrees with the conclusions" in the JFTC Order and that "[t]he Company intends to invoke its right under Japanese law to an administrative hearing before the JFTC, request that the JFTC suspend the [Order] pending a decision following the hearing, and seek a stay of the [Order] from the Japanese courts should the JFTC deny the Company's request."[25]

---

[23] *Id.* For example, the JFTC found that Japanese manufacturers were forced to grant Qualcomm various royalty-free licenses and agree not to assert their intellectual property rights against Qualcomm and its customers and licensees.

[24] 2009 10-K at F-26.

[25] *Id.*

The JFTC granted Qualcomm's request for an administrative hearing on the JFTC Order, but denied Qualcomm's request that the JFTC suspend that order pending the outcome of the administrative hearing. Qualcomm then moved in the Japanese courts for a stay of the JFTC Order pending the administrative hearing, and, in February 2010, the Tokyo High Court granted that motion. The JFTC held the first administrative hearing on February 17, 2010. The JFTC has held over twenty additional hearings since then, and the matter remains pending.

### 5. China's National Development and Reform Commission finds Qualcomm in violation of Chinese antitrust laws

In November 2013, the National Development and Reform Commission of the People's Republic of China (the "NDRC") "notified [Qualcomm] that it had commenced an investigation of the Company relating to the Chinese Anti-Monopoly Law" (the "AML").[26] That same month, the NDRC raided Qualcomm's Beijing and Shanghai offices. On February 9, 2015, the NDRC issued an administrative penalty decision finding that Qualcomm had violated the AML (the "NDRC Decision"). In its Decision, the NDRC concluded that Qualcomm has a dominant position in the wireless telecommunications markets and abuses that dominance by (1) charging licensees royalties for expired and unwanted patents, (2) demanding that licensees provide reverse patent licenses free of charge, and (3)

---

[26]    Compl. ¶ 110.

11

forcing customers to agree to unreasonable and discriminatory conditions to purchase Qualcomm chips.[27]

The NDRC also announced that it had entered into a settlement with Qualcomm whereby Qualcomm agreed to pay an approximately $975 million fine.[28] That penalty amounted to 8% of Qualcomm's sales in China during 2013. In addition, the NDRC Decision required Qualcomm to cease its abusive business practices and to license and sell its patents and technologies to Chinese companies on FRAND terms. Qualcomm agreed not to contest the NDRC Decision or any of its penalties and paid the $975 million fine.

C.      **Procedural History**

Before filing its Complaint, Plaintiff sought books and records from Qualcomm under 8 *Del. C.* § 220 regarding the Board's knowledge of and reaction to the Company's antitrust issues (the "Section 220 Demand"). Qualcomm satisfied that request by "produc[ing] 14,000 heavily-redacted pages of documents, including Board and Board-committee minutes and selected presentations made to the Board."[29]

---

[27]    Chapple Aff. Ex. 1 ("NDRC Decision"), at 11-22.

[28]    *Id.* ¶ 120 ("[T]he NDRC imposed a fine on Qualcomm of 6.088 billion Chinese Yuan Renminbi (*approximately $975 million at current exchange rates*) . . . .").

[29]    Pl.'s Answering Br. 5.

On April 3, 2015, after receiving the documents Qualcomm submitted in response to the Section 220 Demand, Plaintiff filed its Complaint. On June 12, 2015, Defendants filed a motion to dismiss the Complaint under Court of Chancery Rules 12(b)(6) and 23.1 (the "Motion"). The parties submitted briefs supporting and opposing the Motion, and, on April 5, 2016, I held oral argument on the Motion. This Memorandum Opinion contains my rulings on Defendants' Motion.

## D. Parties' Contentions

The Complaint asserts four derivative counts on Qualcomm's behalf against Defendants. Count I is a claim for breach of fiduciary duty against the Director Defendants. Count II is a claim for breach of fiduciary duty against the Officer Defendants. Count III is a claim for corporate waste against all Defendants. Count IV is a claim for unjust enrichment against all Defendants. At oral argument, Plaintiff's counsel agreed that it had waived the Complaint's claims relating to Counts III and IV.[30]

As to the Complaint's remaining Counts, Plaintiff acknowledges that it "did not make a demand on the Board to bring suit asserting [those Counts] because pre-suit demand is excused as a matter of law."[31] According to Plaintiff, demand upon the Board to pursue those claims would have been futile at the time it filed

---

[30] Oral Arg. Tr. 55.

[31] Compl. ¶ 180.

13

the Complaint because a majority of the Board faces a substantial likelihood of liability for the wrongdoing alleged therein. Although Plaintiff's Complaint advances numerous grounds on which Defendants allegedly breached their fiduciary duties, Plaintiff's counsel, at oral argument, narrowed the scope of its claims, noting that "this [action] is really about the oversight claim and the Caremark claim related to the monopolization."[32] In other words, Plaintiff contends that pre-suit demand on the Board was excused because Defendants face a substantial likelihood of liability under Counts I and II for breaching their duty of loyalty by failing to oversee the Company's compliance with applicable antitrust laws.

Defendants dispute that pre-suit demand on the Board would have been futile and claim, therefore, that because Plaintiff did not make such pre-suit demand, the Complaint should be dismissed under Rule 23.1. As to Count I, Defendants contend that the Complaint fails to plead with particularity that a majority of the Board faces a substantial likelihood of liability for acting in bad faith by consciously disregarding their oversight duties. And, as to Count II, Defendants point out that because only two of the fifteen Director Defendants on the Board are also Officer Defendants, a majority of the Board could not possibly

---

[32] Oral Arg. Tr. 16.

14

face a substantial likelihood of liability. Defendants also argue that Plaintiff failed to plead facts upon which relief can be granted under Counts I and II and, therefore, that the Complaint should be dismissed under Rule 12(b)(6).

## II.    ANALYSIS

### A.    Legal Standard for Pleading Demand Futility

A stockholder pursuing a derivative claim in this Court must satisfy the demand requirement embodied in Court of Chancery Rule 23.1. A plaintiff satisfies the demand requirement by either (1) making a demand on the board to undertake a corrective action or (2) demonstrating that any such demand would have been futile and, therefore, that the demand is excused.[33] Where, as here, a plaintiff alleges that a company suffered a corporate trauma because the board acted in bad faith by consciously disregarding their duty to oversee the company's compliance with applicable laws, Delaware courts generally apply the *Rales v. Blasband*[34] test for to analyze demand futility.[35]

---

[33] *See, e.g.*, *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004).

[34] 634 A.2d 927 (Del. 1993).

[35] *See Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) ("The [*Rales*] test applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties."); *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) ([I]n a *Caremark* claim, there is no challenged transaction to test against the business judgment rule. Consequently, in *Rales v. Blasband*, the Supreme Court set out a separate test for demand futility in this limited set of cases." (footnote omitted)),

15

In *Rales*, the Delaware Supreme Court held that when a plaintiff challenges director inaction, rather than a specific transaction, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[36]  A plaintiff may satisfy the *Rales* test for demand futility by demonstrating that the complaint's underlying claims pose a serious threat to a majority of the board.  The complained-of conduct must "be so egregious on its face" that the board could not have exercised its business judgment in responding to a stockholder demand to pursue those claims.[37] "Demand is not excused solely because the directors would be deciding to sue themselves,"[38] and "the mere threat of personal liability . . . is insufficient to

---

*aff'd*, 911 A.2d 803 (Del. 2006); *see also South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012) (applying the *Rales* test for demand futility to director oversight claims); *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *7 (Del. Ch. Oct. 12, 2011) (same); *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *12 (Del. Ch. Jan. 11, 2010) (same); *Desimone v. Barrows*, 924 A.2d 908, 927-28 (Del. Ch. 2007) (same).

[36]   634 A.2d at 934.

[37]   *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[38]   *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009).

challenge either the independence or disinterestedness of directors."[39]  Rather, a majority of the board must face a "substantial likelihood" of personal liability for demand to be excused.[40]  The analysis of whether a majority of the board faces a substantial likelihood of personal liability "is conducted on a claim-by-claim basis."[41]

Finally, "[i]n evaluating whether demand is excused, the Court must accept as true the well pleaded factual allegations in the Complaint,"[42] as well as "all reasonable inferences that logically flow from [those] facts."[43]  Because Rule 23.1 requires that a derivative complaint's allegations be pled with particularity, however, "[v]ague or conclusory allegations do not suffice, rather the pleader must set forth particularized factual statements that are essential to the claim."[44]

---

[39]     *Aronson*, 473 A.2d at 815.

[40]     *Id.*

[41]     *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 58 n.71 (Del. Ch. 2015) (quoting *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014)).

[42]     *Citigroup*, 964 A.2d at 120.

[43]     *Postorivo*, 2008 WL 553205, at *4.

[44]     *Id.* (citing *Brehm*, 746 A.2d at 254).

## B.     Demand Was Not Excused as to Count I Under Rule 23.1

In Count I of the Complaint, Plaintiff seeks money damages against the Director Defendants for breaching their fiduciary duties.  Plaintiff avers that demand would have been futile as to Count I because a majority of the Board faces a substantial likelihood of liability for acting in bad faith by consciously disregarding their duty to oversee the Company's compliance with applicable laws. This is a quintessential *Caremark* claim.

### 1.     Legal standard for a *Caremark* claim

"A breach of fiduciary duty claim that seeks to hold directors accountable for the consequences of a corporate trauma is known colloquially as a *Caremark* claim, in a tip of the judicial hat to Chancellor Allen's landmark decision [*In re Caremark International Inc. Derivative Litigation*]."[45]  "In a typical *Caremark* case, plaintiffs argue that the defendants are liable for damages that arise from a failure to properly monitor or oversee employee misconduct or violations of law."[46]  "The claim is that the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they

---

[45]     *La. Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 340 (Del. Ch. 2012) (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996)), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

[46]     *Citigroup*, 964 A.2d at 123.

18

violated a duty to be active monitors of corporate performance."[47]  A *Caremark* claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," and bad faith on the part of the corporation's directors "is a necessary condition to liability."[48]

In *Stone v. Ritter*, the Delaware Supreme Court restated the bases on which directors may be found liable for a breach of their fiduciary duties under *Caremark*:

> We hold that *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.[49]

---

[47]  *Caremark*, 698 at 967.

[48]  *Id.* at 967, 971.

[49]  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (footnotes omitted) (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006); *Guttman v. Huang*, 823 A.2d 492, 506 (Del. 2003)).

In this case, Plaintiff's claim is based on the second of *Stone*'s two articulations of a *Caremark* claim.

Under this formulation of *Caremark*, a plaintiff may state a valid oversight claim by pleading (1) that the directors knew or should have known that the corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation.[50] In practice, plaintiffs often attempt to satisfy the elements of a *Caremark* claim by pleading that the board had knowledge of certain "red flags" indicating corporate misconduct and acted in bad faith by consciously disregarding its duty to address that misconduct.[51] "A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example,

---

[50] *See Caremark*, 698 A.2d at 971 ("[P]laintiffs would have to show either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of.").

[51] *See, e.g.*, *South*, 62 A.3d at 15 ("A plaintiff . . . can plead that the board consciously failed to act after learning about evidence of illegality—the proverbial 'red flag.'"); *Armstrong*, 2006 WL 391931, at *5 ("[A] *Caremark* plaintiff can plead that 'the directors were conscious of the fact that they were not doing their jobs,' and that they ignored 'red flags' indicating misconduct in defiance of their duties." (quoting *Guttman*, 823 A.2d at 506-07)), *aff'd*, 911 A.2d 802 (Del. 2006); *see also In re Chemed Corp., S'holder Deriv. Litig.*, 2015 WL 9460118, at *22 (D. Del. Dec. 23, 2015) (Mag.'s Report & Recommendation) (distinguishing between actual board knowledge of corporate misconduct and actual board knowledge of "red flags that should have put [the board] on notice about that same misconduct"), *adopted by KBC Asset Mgmt. NV v. McNamara*, 2016 WL 2758256 (D. Del. May 12, 2016) (ORDER).

would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning."[52] The subsequent complained-of "corporate trauma," however, must be sufficiently similar to the misconduct implied by the "red flags" such that the board's bad faith, "conscious inaction"[53] proximately caused that trauma.[54]

> **2. The Complaint pleads insufficient facts to infer that a majority of the Board faced a substantial likelihood of liability under Count I**

Plaintiff's *Caremark* claim, as pled in the Complaint and as refined in its brief and at oral argument, is that the Broadcom Settlement, the KFTC Decision, and the JFTC Order constituted red flags of Qualcomm's misconduct.[55] According to Plaintiff, a majority of the Board was aware of those alleged red flags because

---

[52] *Armstrong*, 2006 WL 391931, at *5.

[53] *South*, 62 A.3d at 15.

[54] *See id.* at 17 ("Although the complaint asserts that the directors knew of and ignored the 2011 safety incidents, the complaint nowhere alleges anything that the directors were told about the incidents, what the Board's response was, *or even that the incidents were connected in any way*." (emphasis added)); *Dow Chem.*, 2010 WL 66769, at *13 (finding "similar [mis]conduct by different members of management, in a different country, in an unrelated transaction" to be "simply too attenuated to support a *Caremark* claim"); *Citigroup*, 964 A.2d at 129 (noting that alleged red flags must put directors "on a heightened alert" to the problems that subsequently cause damage to the corporation).

[55] Oral Arg. Tr. 29-32.

they were disclosed in various SEC filings that a majority of the Board signed.[56] Plaintiff alleges that the Board's conscious disregard for its duty to remedy and prevent that misconduct is evidenced by the absence of any indication that the Board took steps "to address the continuing and repeated violations of fair competition laws in these foreign markets."[57] And, Plaintiff contends that the Board's bad faith, conscious inaction resulted in the NDRC Decision, which included the NDRC's $975 million fine.[58]

I conclude that the Complaint does not plead sufficient facts from which I may reasonably infer that a majority of the Board faced a substantial likelihood of liability under Count I. Specifically, Plaintiff has not pled adequately that the Board's response to the three alleged red flags constituted bad faith. I agree with Defendants, therefore, that Plaintiff has not demonstrated that demand would have been futile as to Count I. Because the Complaint does not plead facts from which I may reasonably infer that the Board acted in bad faith, Plaintiff's *Caremark* claim necessarily fails, and I need not consider (1) whether the Broadcom Settlement, the KFTC Decision, and the JFTC Order actually constituted red flags or (2) whether the Board's response to those alleged red flags proximately caused the damage that

---

[56]    Pl.'s Answering Br. 39.

[57]    Compl. ¶ 72.

[58]    Oral Arg. Tr. 32.

22

Qualcomm suffered from the NDRC Decision. For purposes of evaluating whether the Board acted in bad faith by consciously disregarding its duties, however, I assume that the Broadcom Settlement, the KFTC Decision, and the JFTC Order actually constituted red flags.

### a.    Legal standard for bad faith

In order to plead successfully that the Board's inaction amounted to bad faith, Plaintiff must plead particularized facts from which it is reasonably inferable that the Board consciously disregarded its duties by "intentionally fail[ing] to act in the face of a known duty to act."[59] "'Conscious disregard' involves an 'intentional dereliction of duty' which is 'more culpable than simple inattention or failure to be informed of all facts material to the decision.'"[60] Such inaction "is fully consistent with . . . the lack of good faith conduct that the *Caremark* court held was a 'necessary condition' for director oversight liability, i.e., 'a sustained or systematic failure of the board to exercise oversight.'"[61] Simply alleging that a board

---

[59]    *Disney*, 906 A.2d at 67.

[60]    *Goldman Sachs*, 2011 WL 4826104, at *13 (quoting *Disney*, 906 A.2d at 66).

[61]    *Stone*, 911 A.2d at 369.

23

incorrectly exercised its business judgment and made a "wrong" decision in response to red flags, however, is insufficient to plead bad faith.[62]

In addition, "[u]nder Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."[63] "Delaware law does not charter law breakers," and "a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law."[64] A board also is not insulated from *Caremark* liability merely because it "think[s] it knew better than those charged with enforcing the law, and in fact, often argued with the law itself."[65]

---

[62] *See Citigroup*, 964 A.2d at 131 ("Instead of alleging facts that could demonstrate bad faith on the part of the directors, by presenting the Court with the so called 'red flags,' plaintiffs are inviting the Court to engage in the exact kind of judicial second guessing that is proscribed by the business judgment rule. In any business decision that turns out poorly there will likely be signs that one could point to and argue are evidence that the decision was wrong. Indeed, it is tempting in a case with such staggering losses for one to think that they could have made the 'right' decision if they had been in the directors' position. This temptation, however, is one of the reasons for the presumption against an objective review of business decisions by judges, a presumption that is no less applicable when the losses to the Company are large.").

[63] *Metro Commc'n Corp. BVI v. Advanced Mobilecom Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004).

[64] *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011).

[65] *Id.*

### b. The Board did not consciously disregard the red flags and, therefore, did not act in bad faith

The Complaint cites to a number of items that Plaintiff received in its Section 220 Demand as alleged evidence of the Board's bad faith inaction in the face of the three red flags that indicated continuing violations of antitrust law by Qualcomm's QTL and QCT business segments.[66] Plaintiff points out that "[t]he Board was well aware of Qualcomm's monopolistic conduct from multiple sources," including, for example, "[a] Board package dated February 1, 2012 . . . in preparation for the directors' March 5, 2012 meeting," which stated that it was the Company's intention in China to "[c]ontinue to monitor and attempt to influence direction of SAC/CNIS regulations, indigenous innovation policies and regulation of license fees under guise of anti-monopoly law" to protect its business model and preserve its intellectual property.[67] Plaintiff also highlights "a Board package dated June 17, 2013 . . . in preparation for the directors' July 15, 2013 meeting," which stated that "some companies in China have started to use their Anti-Monopoly Law (AML) against foreign companies as a competitive tool and as a way of reducing their cost."[68] Further, Plaintiff notes that the Board's Audit

---

[66] Compl. ¶¶ 63-72.

[67] *Id.* ¶¶ 63, 66.

[68] *Id.* ¶ 67.

Committee materials "for each year between 2010 and 2014" included draft 10-Ks with "a description of the pending investigations and regulatory actions"[69] and that "the 10-Ks for each year between 2009 and 2014 have a description of the pending investigations and regulatory actions, and each was signed by each board member, who constitute a majority of the Director Defendants."[70] Plaintiff then alleges broadly that in response to the Section 220 Demand, Defendants failed to produce "any evidence of any efforts or actions the Board undertook to address the continuing and repeated violations of fair competition laws in these foreign markets."[71] From this, Plaintiff concludes that "[t]he only reasonable inference is that the Board consciously declined to act in the face of a known duty to do so."[72]

Plaintiff relies most heavily, however, on a June 28, 2010 Board package prepared in anticipation of the Board's July 30, 2010 meeting. That package—which is addressed to Alexander, Cruickshank, Dittamore, Horton, Jacobs, Lansing, Nelles, Scowcroft, Stern, Mollenkopf, and Wang—contains a strategic plan review (the "July 30, 2010 Plan").[73] Slide fifty-one of that Plan includes a

---

[69]     *Id.* ¶ 70.

[70]     *Id.* ¶ 71.

[71]     *Id.* ¶ 72.

[72]     *Id.*

[73]     Chapple Aff. Ex. 14, at Melbourne0003999.

26

"Strategic Imperative," stating that "[w]e continue to see aggressive efforts worldwide to increase regulation of IP or create new rules / laws that devalue IP" and highlighting "[r]ecent activity in Europe, China, India, Japan, Korea and U.S."[74] That slide also indicates that the Board expected to continue to face regulatory complaints and investigations" in the future.[75] Given its timing—ten months after the JFTC Order—it is reasonable to infer that the Plan was referencing the three alleged red flags.

Slide fifty-one of the July 30, 2010 Plan also includes an "Action Plan" in response to the Strategic Imperative. The Board's Action Plan includes the following items: "Proactively Lobby Government Agencies/Officials," "Academic Advocacy Program to foster creation and publication of favorable papers on key issues," "Speak / Present at key conferences on competition, standards and IPR around the world," "Creation / participation in coalitions of like-minded companies," and "Improve Image / Brand Awareness."[76] In other words, the Board's July 30, 2010 Plan to respond to the three red flags was based largely on public relations and lobbying rather than substantive change to their QTL and QCT business segments to avoid potential future antitrust violations. That response

---

[74]     *Id.*

[75]     *Id.*

[76]     *Id.*

appears to have been based on the Board's views that Qualcomm's business practices were not, in fact, violative of any country's antitrust laws and that the legal actions it faced were the result of political and competitive opposition, as opposed to an indication of actual illegal conduct.

The Board's attitude as reflected in the July 30, 2010 Plan also is consistent with the Board's disclosed views on the three red flags in its public SEC filings. In its 2009 10-K, the Board characterized the Broadcom Action as "without merit."[77] The Board also, in that same 10-K, stated that "[t]he Company disagrees with the conclusions" in the JFTC Order.[78] In its 2010 10-K, the Board stated that it "believes that its practices do not violate South Korean competition law, are grounded in sound business practice and are consistent with its customers' desires."[79] And, the Board promptly appealed both the JFTC Order and the KFTC Decision.

Plaintiffs contend that this situation resembles the bad faith inaction that the Court found sufficient to plead a *Caremark* claim in *In re Massey Energy Co.*[80]

---

[77] 2009 10-K at F-27

[78] *Id.* at F-26.

[79] 2010 10-K at F-26.

[80] 2011 WL 2176479. Although Defendants point out that *Massey* found that the plaintiffs had pled a *Caremark* claim for purposes of Rule 12(b)(6) rather than Rule 23.1, I note that the Court acknowledged that "the plaintiffs have likely pled

The *Massey* decision involved "a coal mining corporation . . . [c]onvinced that it knew better than the public authorities charged with enforcing laws designed to make mining a safer and cleaner business."[81] The company's CEO in *Massey* "believ[ed] he knew better about how to run mines safely than the" government agency charged with regulating mine safety and "publicly stated that the idea that governmental safety regulators knew more about mine safety than he did was silly."[82] The *Massey* plaintiffs pled "that the independent directors of the Massey Board did not make a good faith effort to ensure that Massey complied with its legal obligations" and that the board failed to "respond to numerous red and yellow flags by aggressively correcting the management culture at Massey that allegedly put profits ahead of safety."[83] Then-Vice Chancellor Strine held as follows:

> To be plain, when a company already has been proven to have engaged in illegal conduct, it is a high risk strategy for it to embrace the idea that its regulators are wrongheaded and to view itself as simply a victim of a governmental conspiracy. . . . As a kid, most of us are taught that it is not a good excuse to argue with the rules. Telling your parents that all the kids are getting caught shoplifting, cheating, or imbibing illegal substances is

---

[a *Caremark* claim] that would survive a motion to dismiss, even under the heightened pleading standard applicable under Rule 23.1." *Id.* at *21.

[81]     *Id.* at *1.

[82]     *Id.* at *19.

[83]     *Id.*

> not, fortunately, a good excuse. For fiduciaries of Delaware corporations, there is no room to flout the law governing the corporation's affairs. If the fiduciaries of a Delaware corporation do not like the applicable law, they can lobby to get it changed. But until it is changed, they must act in good faith to ensure that the corporation tries to comply with its legal duties.[84]

The Court, therefore, agreed with the plaintiffs that it was reasonable to infer that the Board had consciously disregarded its duties in bad faith.

Similarly, Plaintiff notes that in *Louisiana Municipal Police Employees' Retirement System v. Pyott*,[85] the plaintiff brought a *Caremark* claim against Allergan, Inc.'s board for failing to prevent the company's continuing violations of the U.S. ban on off-label drug marketing. As the Court noted, "[b]ecause a physician legally can prescribe a product for off-label use, a manufacturer legally can sell a product notwithstanding its potential off-label use. It is *illegal,* however, for a manufacturer to *market* a drug for off-label use."[86] The company's general counsel advised the board that the company likely had engaged in such illegal conduct.[87] The plaintiffs in *Pyott* claimed that, despite the general counsel's warning, "the Board discussed and approved a series of annual strategic plans that

---

[84]     *Id.* at *21 (footnotes omitted).

[85]     46 A.3d 313.

[86]     *Id.* at 317-18.

[87]     *Id.* at 320.

contemplated expanding Botox sales dramatically within geographic areas that encompassed the United States" and that those "plans contemplated new markets for Botox that involved applications that were off-label uses in the United States."[88] Vice Chancellor Laster held as follows:

> It is not unreasonable to infer that the Board and CEO saw the distinction between off-label selling and off-label marketing as a source of legal risk to be managed, rather than a boundary to be avoided. Based on this premise, the CEO and his management team devised, and the Board approved, a business plan that relied on off-label-use-promoting activities, confident that the risk of regulatory detection was low, that most regulatory problems could be solved, and that dealing with regulatory risk was a cost of doing business. As profits increased and the regulatory risk seemed well managed, the extent of off-label use-promoting activities grew. The appearance of formal compliance cloaked the reality of non-compliance, and directors who understood the difference between legal off-label sales and illegal off-label marketing continued to approve and oversee business plans that depended on illegal activity.[89]

As a result, the Court concluded that the plaintiffs' *Caremark* claim should survive the defendants' motion to dismiss under Rule 23.1.

Plaintiff posits that the Board's response to the alleged red flags in this case constitutes bad faith under *Massey* and *Pyott* because it is reasonable to infer that the Board was on notice as to Qualcomm's misconduct and consciously

---

[88]      *Id.* at 352.

[89]      *Id.* at 355-56 (footnotes omitted) (citing *Massey*, 2011 WL 2176479, at *19).

31

disregarded its duty to remedy or prevent that misconduct. Plaintiff contends that the Board's "consciousness" is demonstrated by the fact that in the July 30, 2010 Plan it explicitly considered the past and potential future regulatory actions. The Board's "inaction" allegedly is demonstrated by the fact that it failed to alter its business practices to avoid further antitrust violations. According to Plaintiff, therefore, just as the defendants in *Massey* were not insulated from liability simply because they disagreed with the regulator's interpretation and application of the relevant law, the Director Defendants here are not insulated simply because they believed they were unfairly being targeted by regulators and competitors. Instead, the alleged red flags put the Board on notice as to misconduct at Qualcomm, triggering the Board's obligation to take actions in good faith to avoid further misconduct.

Both *Massey* and *Pyott*, however, are distinguishable from this case. The red flags alleged in *Massey* were far more egregious and indisputable than those alleged here. Notably, in *Massey*, the company "pled guilty to criminal charges including one felony count for willful violation of mandatory safety standards resulting in death, eight counts for willful violation of mandatory safety standards, and one count for making a false statement, and agreed to pay a $4.5 million

fine."[90] Further, the company's attitude regarding coal mining safety indicated not simply that it disagreed with the regulator's interpretation of applicable safety laws, but "that the company's management knew better than the law about what was necessary to run safe mines."[91] Although the Board at all times has maintained that its business practices do not violate applicable antitrust laws, Plaintiff fails to allege that the Board ever expressed disagreement with the underlying laws themselves.

In addition, the plaintiffs' *Caremark* claim in *Pyott* alleged that Allergan's board caused the company to adopt a business plan that included illegal conduct. The Court concluded that "a reasonable inference can be drawn from the particularized allegations of the Complaint and the documents it incorporates by reference that the Board knowingly approved and subsequently oversaw a business plan that required illegal off-label marketing and support initiatives for Botox."[92] Thus, contrary to the formulation of *Caremark* in this case and in *Massey*,[93] the board's alleged bad faith in *Pyott* was not based on its conscious disregard for its duty to *prevent* the company from engaging in illegal conduct. Instead, it was

---

[90]    2011 WL 2176479, at *6.

[91]    *Id.* at *19.

[92]    *Pyott*, 46 A.3d at 356.

[93]    *See supra* text accompanying note 32.

based on the board's alleged decision to *cause* the company to engage in illegal conduct. Even if Plaintiff alleged a *Pyott*-style *Caremark* claim, the Complaint does not include any particularized allegations indicating that the Board knowingly caused Qualcomm to adopt any monopolistic practices.

In this case, even if the alleged red flags actually constituted evidence of misconduct at Qualcomm, it is unreasonable to infer that the Board consciously disregarded its fiduciary duties in response to those red flags. The Complaint concedes that the Board continuously monitored each of the three alleged red flags as well as the NDRC Decision. The Complaint also acknowledges that the Board consistently expressed—both verbally and through its actions—its view that its business practices were not violative of international antitrust laws and elected to address the relevant legal actions by focusing on educating industry participants and government officials as to why its practices were legal and by pursuing appeals. As such, Plaintiff's argument is not that the Board completely failed to act in response to those red flags, but instead that the Board's response was insufficient. Red flags that rise to the severity of those in *Massey* may implicate an immediate duty to alter a company's culture and business practices. This case, however, is not one in which the company pled guilty to criminal charges—as in *Massey*—or was advised by its general counsel that its business plan included potentially illegal conduct—as in *Pyott*. On the contrary, the Complaint indicates

34

that the Board, at all times, was under the impression that its conduct did *not* violate applicable antitrust laws. Plaintiff, therefore, fails to allege that the Board acted in bad faith where it concluded that Qualcomm's business practices were legal, appealed the regulatory findings and penalties, and publicly proclaimed the Company's innocence.

Because the Complaint fails to plead particularized facts from which it is reasonable to infer that the Board faces a substantial likelihood of liability as to Count I, demand was not excused as to Count I under the *Rales* test for demand futility. As such, that Count is dismissed under Rule 23.1.

### C. Demand Was Not Excused as to Count II Under Rule 23.1

Plaintiff's legal theory in Count II is the same as in Count I.[94] The *Rales* test for demand futility, therefore, applies to Count II as well.[95] At oral argument, Plaintiff's counsel indicated that despite the dearth of claims as to the Officer Defendants in its answering brief, Plaintiff did not intend to waive Count II.[96] It is unclear, however, how a majority of the Board could face a substantial likelihood of liability as to Count II when only two of the fifteen members of the Board—

---

[94] *See* Oral Arg. Tr. 16, 55 ("I think this is really about the oversight claim and the Caremark claim related to the monopolization. . . . Count II is a breach of fiduciary duty against officers qua officers . . . .").

[95] *See supra* note 35 and accompanying text.

[96] Oral Arg. Tr. 55.

Jacobs and Mollenkopf—are included as Officer Defendants. Assuming Plaintiff seeks to avoid dismissal of Count II under an alternative theory of demand futility, Plaintiff has not articulated that theory in either its brief or at oral argument. Thus, Plaintiff has failed to plead that demand would have been futile as to Count II of the Complaint, and that Count also is dismissed under Rule 23.1.[97]

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion is granted.

**IT IS SO ORDERED.**

---

[97] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").